AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the Central District of California

```
                                        FILED
                                CLERK, U.S. DISTRICT COURT

                                     9/4/2024

                                CENTRAL DISTRICT OF CALIFORNIA
                                BY: _____ D.C. _____ DEPUTY
```

United States of America

v.

Tyrie Contreras and,
Kenyon Watson

Defendants

Case No.  5:24-mj-00366

```
              LODGED
        CLERK, U.S. DISTRICT COURT

           09/04/2024

      CENTRAL DISTRICT OF CALIFORNIA
      BY: _____ AP _____ DEPUTY
```

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  In the county of San Bernardino, in the Central District of California, the defendants violated the follow statutes on or about the following dates:

| Code Section | Offense Description | On or about: | Defendant: |
|---|---|---|---|
| 18 U.S.C. §§ 1951(a) | Interference with Commerce by Robbery | August 9, 2024 | Tyrie Contreras and Kenyon Watson |
| 18 U.S.C. § 924(c) | Use, Carry, or Brandish a Firearm in Furtherance of a Crime of Violence | August 9, 2024 | Tyrie Contreras |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearm | August 23, 2024 | Tyrie Contreras |

This criminal complaint is based on these facts:  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Pursuant to Fed. R. Crim. P. 4.1_
*Complainant's signature*

Jarrett Keegan, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _9/4/2024_

_____
*Judge's signature*

City and state:  _Los Angeles, California_

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Peter Dahlquist

## AFFIDAVIT

I, Jarrett Keegan, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant for Tyrie CONTRERAS ("CONTRERAS") for violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery) and 924(c) (Use, Carry, or Brandish a Firearm in Furtherance of a Crime of Violence) which occurred on August 9, 2024, and a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) which occurred on or about August 23, 2024.

2.   This affidavit is also made in support of a criminal complaint and arrest warrant for Kenyon WATSON ("WATSON") for a violation of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery) which occurred on August 9, 2024.

3.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the United States
Department of Justice, Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") in San Bernardino, California.  I joined ATF
in July 2014.  Before becoming an ATF SA, I was a Federal Air
Marshal with the Federal Air Marshal Service for seven years.
During my career in federal law enforcement, I have received
extensive training regarding federal criminal law.  My education
includes a Bachelor's Degree in Aerospace Studies from Embry
Riddle Aeronautical University and a Master's Degree in Security
Management from American Military University.

5.    As an SA, I have completed training at the ATF
National Academy and the Federal Law Enforcement Training Center
related to federal firearms and narcotics laws and
regulations.  I regularly refer to these laws and regulations
during the course of my duties and have written and participated
in the execution of numerous search and arrest warrants for
violations of these statutes.  During my career in the field, I
have participated in the investigation, surveillance, and arrest
of numerous prohibited persons in possession of firearms, as
well as firearms and narcotics traffickers, and persons engaged
in crimes of violence such as robbery, carjacking, attempted
murder, and murder.

## SUMMARY OF PROBABLE CAUSE

6.    On the afternoon of August 9, 2024, three masked
suspects conducted a takeover-style robbery of a San Bernardino
marijuana dispensary.  After passing through the lobby of the

3

dispensary, CONTRERAS and a currently unidentified masked male suspect made their way to the dispensary's main showroom.  Both CONTRERAS and the currently unidentified man held silver and black semiautomatic pistols in their hands.  Entering the showroom, the two gunmen ordered three female employees behind the counter to the ground, with the unidentified suspect racking his pistol and ejecting a 9mm round to the showroom floor before moving behind the counter.  CONTRERAS then climbed over a glass display case and pressed the barrel of his pistol to the head of one of the employees, who at that point, was lying on the floor with her face down.

7.  While CONTRERAS and the unidentified suspect were in command of the showroom, WATSON remained in the lobby with a fourth female employee who had gone to the ground as soon as the three robbers had entered the dispensary.  WATSON took a cell phone out of the employee's hands before rummaging through the lobby desk.  WATSON then threw a tablet and radio away from the employee's reach, before joining the other two suspects in the next room.

8.  In the showroom, with the three female employees still lying face down on the ground, CONTRERAS, WATSON, and the other unidentified suspect stole marijuana product from glass display cases and from racks on the wall, before taking cash from the register and cell phones from the employees.

9.  After finding the safe, CONTRERAS forced one of the female employees up from the ground and moved her to the room with the safe, all while pointing his firearm at her back.

WATSON then forced the female employee from the lobby to the
showroom, where she joined the others on the ground.  Unable to
open the safe in the back room, WATSON then pushed the safe out
and across the showroom floor to the lobby, before leaving the
dispensary just briefly to put his backpack in the BMW and
communicate with the getaway driver outside.  WATSON then
returned inside to grab more marijuana product with the two
others.

10.  As the three robbers then made their exit out the
front door of the dispensary, two uninvolved vehicles arrived in
the dispensary parking lot.  After loading the safe into the
back seat of WATSON's white BMW sports sedan, the unidentified
suspect pointed his firearm at both vehicles, just as WATSON
assisted CONTRERAS with the loading of stolen merchandise into
the trunk of the BMW.  All three then got into the BMW and sped
away before police arrived.

11.  The license plate of WATSON's white BMW 3 series sedan
was captured on surveillance video at the dispensary.  The
vehicle was linked to commercial license plate reader hits at
WATSON's parole address in Perris, California.  On the day of
the robbery, license plate readers captured the BMW as it
traveled from Perris to San Bernardino.  Call detail records
associated with the cell phone number WATSON provided to his
parole officer showed communications with the cell phone number
CONTRERAS provided to his parole officer.  Two phone calls
between the two numbers occurred less than 90 minutes before the
robbery.  WATSON's social media account included multiple photos

of WATSON's BMW as well as the shoes and backpack used by WATSON during the robbery.

12.  CONTRERAS was arrested by Colton Police Department on August 23, 2024, following a home invasion robbery and lengthy vehicle pursuit, which ended with CONTRERAS crashing the victim's stolen vehicle.  CONTRERAS fled on foot, tossing a grey Nike Air Jordan branded backpack before finally being apprehended.  The backpack was searched and found to contain a loaded silver and black Smith and Wesson SD40 VE .40 caliber pistol.  The firearm and the backpack matched those on surveillance video in CONTRERAS' possession during the dispensary robbery on August 9, as did the pants CONTRERAS was wearing when he was taken into custody.  Additional evidence linking CONTRERAS to the dispensary robbery was identified during a review of CONTRERAS' social media.

13.  Investigators have not yet identified the getaway driver or the third suspect who racked his pistol during the dispensary robbery.

## STATEMENT OF PROBABLE CAUSE

14.  The following summary of the investigation is based upon my conversations with other law enforcement officers, my review of police reports, surveillance and witness videos, body worn camera ("BWC") footage, and other materials, as well as my own knowledge of the investigation.

### A.  Robbery of Marijuana Dispensary on August 9, 2024

15.  On August 9, 2024, at approximately 4:07 p.m., San Bernardino Police Department ("SBPD") dispatchers received a

report of an armed robbery which had just occurred at Tree Factory, a marijuana dispensary located at 654 S. Lincoln Ave. in San Bernardino, California.  Patrol units responded to the scene, but the suspects fled prior to the officers' arrival. Patrol officers interviewed victims and witnesses and collected surveillance and witness video.

16.  A review of the dispensary's surveillance video showed at approximately 4:01 p.m., a white 2007 BMW 3 series sedan, with California license plate 8ROM975, traveled north on S. Lincoln Ave., a short cul-de-sac commercial street south of downtown San Bernardino.  The BMW turned into the parking lot of Tree Factory, a marijuana dispensary which occupied the northeast corner of a non-descript commercial building.  The dispensary's glass front doors faced north to the parking lot, with metal security bars covering the doors and surrounding windows.  Above the front doors was a large black sign displaying the business name.

17.  The BMW traveled west and pulled into a spot in the northwest corner of the lot, before backtracking east in front of the dispensary front doors.  The dispensary's exterior surveillance cameras, which faced the parking lot, captured the heavily damaged rear door on the passenger side of the BMW sedan.  The BMW then stopped on the concrete apron and then backed up, reversing into the second parking spot inside the lot, just outside the front doors of the dispensary.

18.  Just a few seconds after the BMW came to a stop, the rear driver's side door and front passenger side door opened at

about the same time, with two hooded and masked suspects then
sprinting to the front door of the business.  The suspect from
the front passenger seat, thus far unidentified (further
referenced as "unidentified suspect"), was the first to enter
the business.  He appeared to be an adult male, wearing black
shoes with a metallic accent near the toe box, black socks,
black shorts, and a black hoodie with a yellow design on the
front.  The unidentified suspect wore light colored grey or
green gloves and had an object resembling a silver and black
Smith and Wesson SD series pistol in his left hand.

19.  Entering the dispensary behind the unidentified
suspect in the black shorts was a suspect later identified as
WATSON, who had exited the rear driver's side door of the BMW.
WATSON wore white high top Nike Air Jordan sneakers with red
bottoms and white soles.  He also wore dark colored jeans with a
faded front, a white hoodie with "POLO" written across the
chest, and black Franklin batting gloves with white accents.
WATSON carried a black backpack with a screen print of open
shark mouth on the lower portion of the bag.  The backpack was
unzipped and the red inside liner was visible on the video.

20.  Following WATSON from the BMW through the dispensary
doors was a suspect latter identified as CONTRERAS, who wore
black athletic shoes, black pants, a black hoodie, and black
Franklin batting gloves with gold accents.  CONTRERAS' black
pants had the word "RUTHLESS" written across the crotch in large
bold white letters with a red outline.  On the back of the left
pant leg was a logo with a large red "R" and "1991."  CONTRERAS

8

carried a grey backpack with the red Nike Air Jordan logo embossed on the back.  CONTRERAS carried an object resembling a silver and black Smith and Wesson SD series pistol in his right hand as he entered the dispensary.  The driver of the BMW remained inside the vehicle and out of sight of the surveillance cameras throughout the robbery.

21. Seeing the three masked and armed men entering the business, a female employee immediately hid behind a receptionist desk located in the dispensary's lobby.  The unidentified suspect and CONTRERAS then bypassed the employee, accelerating their movement and sprinting down the hallway past the frightened lobby employee towards the dispensary's showroom. As they did so, their firearms were out in front of them. WATSON remained in the lobby and went around the desk toward the employee, who momentarily began to get up and grab her phone from the desk as WATSON removed it from a charger.  WATSON then ripped it away from the employee's outstretch hands, before taking off to join the others in the showroom.

22. A few seconds later, WATSON returned, causing the employee to appear scared as the employee who was still down behind the desk.  WATSON then ransacked the drawers in the desk before throwing a tablet and walkie talkies across the room.  As this was occurring, an unidentified customer in a pickup truck arrived in the parking lot.  The customer then momentarily opened the door to the dispensary, but fled after seeing WATSON.

23. Inside the showroom, before the two gunmen ran in from the lobby, three female employees were casually standing behind

9

glass display cases which were positioned on the south and west walls of the dispensary.  Once the suspects entered the lobby, all three women started moving toward a back hallway behind the southern display case.  The unidentified suspect was the first gunman to enter the room.  He had his weapon out in front of him in his right hand and pointed it in the direction of two of the employees.  The pistol appeared to have a weapon mounted light or laser affixed beneath the pistol frame.

24. As the unidentified suspect approached the southern counter, he racked the weapon, ejecting a live 9mm round from the pistol.  The round was not found until the following day, when employees of the dispensary found it concealed behind a counter door.

25. Entering the showroom room behind the unidentified suspect was CONTRERAS, with his pistol outstretched in front of him and pointing it at the third employee in the room.  The unidentified suspect then moved behind the counter, and began standing over two of the employees, before CONTRERAS flipped over a glass display case around the time WATSON first briefly entered the showroom.  After CONTRERAS was behind the counter, he immediately pressed his firearm to the head of the third employee, still face down to the floor.  I have included a cropped surveillance screenshot below, capturing this moment during the robbery and highlighted in the yellow circle:



26.  The unidentified suspect appeared to briefly search the two employees under his control, before leaving the showroom to look into the remaining rooms inside the dispensary. CONTRERAS removed his firearm from the head of the employee on the floor and appeared to anxiously pace while watching all three employees behind the counter.  WATSON reentered the showroom and discarded multiple cell phones to the floor before CONTRERAS began gesturing towards the product along the west display wall.

27.  The unidentified suspect returned to the showroom as CONTRERAS was removing cash from a register just in front of the hallway leading to the back rooms of the dispensary.  The unidentified suspect joined WATSON filling their respective backpacks with stolen merchandise before meeting up with

CONTRERAS. The unidentified suspect and CONTRERAS then appeared to be addressing one of the employees lying on the ground beneath them. WATSON then followed the unidentified suspect into a back room where the safe was located, before CONTRERAS pulled one of the victims up from the ground and forced her at gunpoint to move to the room with the safe. I have included several cropped surveillance screenshots below, capturing this movement:

  

28. As CONTRERAS moved the employee and passed her off to the unidentified suspect in the room with the safe, WATSON exited the room and quickly ran out toward the lobby. He returned with the employee who was originally seated behind the receptionist desk, moving her from the lobby to the showroom before passing her off to CONTRERAS, who made her join the others on the floor behind the counter.

29. About the same time, the unidentified suspect returned with the employee from the back room, directing her to the ground, before straddling her between his feet. WATSON moved to the room with the safe and was joined shortly thereafter by the

unidentified suspect.  CONTRERAS remained in the showroom where
he watched over the four employees while still grabbing
merchandise.

30.  Approximately two minutes after the robbery suspects
entered the showroom, WATSON pushed a large black safe from the
back room into the showroom.  He then pushed the safe across the
showroom floor and out to the lobby.  Leaving the safe just
inside the dispensary's lobby doors, WATSON then briefly exited
the dispensary to communicate with the getaway driver waiting in
the BMW, opening the rear door on the driver's side and tossing
in his black shark mouth backpack.  WATSON then reentered the
lobby, not even taking the time to close the car door.

31.  While this was occurring, the unidentified suspect
then joined CONTRERAS in looting a closet next to one of the
display cases.  The two suspects found the closet filled with
merchandise, and CONTRERAS took a large yellow bin from inside
the business to carry away the stolen product.  WATSON then
momentarily reappeared in the showroom, gesturing in a manner
that suggested to me he was signaling for the other robbers to
finish up.  All three robbers then departed the showroom towards
the lobby, as nearly three minutes had elapsed since the start
of the robbery.  The female employees remained face down on the
floor behind the counter, with two of the young women reaching
out to hold on to one another as the violent encounter
concluded.

32.  Outside, a witness from a nearby business recognized a
robbery was in progress inside the dispensary.  The witness

began recording with his cell phone, videoing the white BMW which was outside the front doors of the dispensary. The witness videoed the BMW as it moved back and forth in the lot several times throughout the robbery, before finally backing up and settling in about the same place as it had been at the start of the robbery, just out front of the dispensary doors. WATSON exited the dispensary followed by the unidentified suspect who was carrying the black safe. The two walked towards the awaiting BMW, just as two uninvolved vehicles entered the lot, both apparently unaware of the robbery in progress. The first vehicle, a small silver compact sedan, parked in a parking spot just a space or two west of the BMW. The second vehicle, a dark colored Buick SUV, came to a stop with its front axle just barely on the parking lot apron. WATSON escorted the unidentified suspect to the open rear driver's side door of the BMW sedan, before opening the driver's door and bending down just inside the door hinge, near the BMW's dash.

33. After unloading the safe into the back seat of the BMW, the unidentified suspect moved to the rear passenger side of the BMW. He then pulled out his pistol and pointed it at the silver sedan. He then transitioned and pointed the pistol in the direction of the Buick SUV. I have included a surveillance video screenshot below which captures this moment.



34.  The unidentified suspect then walked to the front
passenger door of the BMW as he gestured to the vehicles to get
out of the way.  WATSON then moved from the open driver's door
to the now open trunk of the BMW, assisting CONTRERAS with the
loading of the yellow container filled with stolen merchandise.
WATSON then entered the backseat behind the driver as the
unidentified suspect entered the front seat.  Unable to fit the
bin into the sedan's small trunk, CONTRERAS then dumped the
remaining contents in the trunk and closed the trunk before
moving to the open rear driver side door following WATSON.
Before CONTRERAS was inside the vehicle, the BMW began to leave.
WATSON was left scrambling to close the door, losing some
merchandise to the asphalt below as the vehicle sped out of the
from the parking lot.  WATSON was only able to get the door
closed once the vehicle was halfway down the street from the
dispensary, still within view of the witness filming.

35.  Once SBPD officers arrived, the female employee who
was taken into the room with the safe said she was grabbed by
one of the suspects.  She stated she was ordered to show them
where the safe was located, telling officers that one of the

suspect's held a gun to her head.  She stated the suspects'
stole her phone and an estimated $500 in cash from the
dispensary, but stated the safe was empty.  Her phone was later
recovered on a sidewalk approximately a mile south of the
dispensary.  Officers returned the phone to the victim.

**B.    Identification of the Robbery Vehicle**

36.  On August 12, 2024, I queried California Department of
Motor Vehicles ("DMV") databases for the license plate 8ROM975,
which was the plate displayed on the BMW used in the robbery.
The registration was expired with the most recent DMV entry for
the vehicle dating back to 2020.  The entry showed the BMW being
purchased by a buyer using a commercial strip mall address in
Palmdale, California.

37.  I then conducted a query of local license plate
readers ("LPRs").  The BMW was recorded by a commercial LPR
reader parked at the curb just in front of the residence located
at 3854 Bluff St. in Perris, California on August 8, 2024, one
day prior to the robbery.  The vehicle was parked in the same
spot on August 7th, then in the driveway of 3854 Bluff St. on
August 6, August 5, and August 1, 2024.

38.  Additionally, approximately an hour before the robbery
on August 9, 2024, the BMW was recorded by a license plate
reader traveling north in Perris, just 1.6 miles north of 3854
Bluff St.  The vehicle was captured again by LPRs as it traveled
north entering Moreno Valley at 3:20 p.m., approximately 5.6
miles north of the Bluff St. residence.  Finally, at 3:37 p.m.,
approximately thirty minutes before the robbery, the BMW again

was scanned by LPRs on Reche Canyon Rd., a canyon road which acts as a freeway bypass shortcut between Moreno Valley and the south end of Colton, California.  The BMW did not scan again on LPRs until 7:34 p.m., when it was recorded traveling through Moreno Valley.

### C.    Identification of the WATSON as a Robber

39.  Law enforcement databases were queried using the 3854 Bluff St. address.  The inquiries revealed the residence to be associated with WATSON, who was placed on parole with the California Department of Corrections and Rehabilitation ("CDCR") on June 1, 2024.  WATSON's underlying parole charges include burglary and possessing a weapon as a prohibited person.  CDCR databases revealed WATSON listed 3854 Bluff St. as his address of record, with WATSON also confirming cell phone number 909-633-1715 with CDCR on July 10, 2024.

40.  WATSON's presence at 3854 Bluff St. was confirmed during the early morning hours of August 2, 2024, when just seven days before the robbery, officers with the San Diego Police Department ("SDPD") Special Operations Unit initiated a surround and call out operation at the residence.  SDPD officers were there to arrest WATSON's younger brother, Keshaun Watson ("Keshaun"), who was wanted on a felony warrant out of the Superior Court of California, County of San Diego, for burglary and conspiracy.  Both WATSON and his father, K.W.,[1] exited the

---

[1] The true identities of the witnesses and victims referred to in this affidavit are known to law enforcement.  However, to maintain the integrity of the investigation and to prevent
*(footnote cont'd on next page)*

residence and were contacted by officers, being released on scene after Keshaun was taken into custody.  I queried inmate records which revealed Keshaun was in the custody of the San Diego Sheriff's Department at the time of the dispensary robbery.

41.  On August 13, 2024, I received recordings of jail calls associated with Keshaun's inmate account.  I learned Keshaun remained in the custody of the San Diego County Sheriff's Office ("SBSO") following his arrest in Perris and requested calls from August 2 through August 13, 2024.

42.  On August 15, 2024, I reviewed jail call recordings delivered by SBSO and recorded at the George Bailey Detention Center in San Diego, California.  Two recordings were associated with 909-633-1715, the cell phone number WATSON listed with CDCR.  Both of the recordings were on August 10, 2024, the day after the robbery.

43.  The first call, recorded at 4:20 p.m., lasted only one minute and 38 seconds.  No name prompt was requested at the onset of the call, however, I heard two younger male voices about 15 seconds into the call.  After the subject on the receiving end of the call said "hello" the two males called each other names, before the subject on the receiving end of the call said, "I say that cause ah, you know ah, you know the little store n*gga probably came to in the Dino?"  "Down near . . . ." The in-custody outbound caller interrupted, stating, "In the

_____

witness/victim intimidation and to protect the privacy of the witnesses, I have not included full legal names in this affidavit.

Dino?"  "Oh yeah."  The subject on the receiving end of the call
then said something which sounded like, "I brought Esco up."  "I
brought Esco's punk ass here."  The outbound caller sounded
confused, replying, "You say you brought him here?"  The
subject on the receiving end of the call then said, "I'm trying
to find a fit before tomorrow," but without providing further
context.  The term "Dino" is a popular slang term for the City
of San Bernardino.

44. A second call, occurring at 8:55 p.m., lasted nearly
15 minutes.  At the start of the call, just after the automated
prompt, one subject on the call stated "Keshaun Watson" which
spurred the subject on the other end of the call to say, "Kenyon
Watson, what's up blood."  Based on the account and the totality
of the two calls, it appeared the outbound call was from Keshaun
and the recipient of the call was his older brother, WATSON.
The two brothers then discussed Keshaun's pending criminal case,
before the Keshaun asked his brother where he was.  WATSON
replied, "We're out here at the room with Esco's punk ass."  A
little bit later, the male subject on the receiving end of the
call stated, "N*gga, why is it like as soon as you go to jail
n*ggas, n*ggas . . . ."  Before the subject could finish, he was
interrupted by Keshaun, who said, "Always do something and when
I come out there ain't shit going on."

45. When one of the subjects on the call explained a lack
of engagement with Keshaun due to being high, Keshaun angrily
replied, "Bitch, what the fuck that got to do with me?"  "Do I
give a fuck about some weed right now?"  Later in the call, it

sounded like Keshaun asked his brother if he was happy.  WATSON
replied, "Yeah I am buzzed, (unintelligible) it's crazy right
now," which Keshaun responded, "Yeah cuz, N*gga you did just say
some federal shit."  Kenyon replied, "Yeah, I ain't lying."

46.  On August 22, 2024, a search warrant was sent to
Verizon Wireless for the call detail records, advance timing
report, and GPS locations associated with WATSON'S cellphone
number of 909-633-1715.  The warrant was authored by SBPD
Officer B. Keil and approved by the Honorable Judge Tara Reilly
of the Superior Court of California, County of San Bernardino.

47.  On August 26, 2024, I reviewed the requested records
returned from Verizon Wireless.  I examined data and saw a 30
second incoming call to WATSON's phone which occurred at 4:26
p.m., about 20 minutes after the robbery.  During the call,
WATSON's cell phone connected with a cell phone tower just over
a mile southwest of the dispensary.

48.  Also on the day of the robbery, WATSON's cell phone
received a call from 909-745-0929, a number which later
investigation would reveal belonged to CONTRERAS.  The call
occurred at 2:48 p.m., 90 minutes prior to the robbery, and
lasting less than two minutes.  Then at 2:54 p.m., WATSON called
CONTRERAS's number, with the call ending just under a minute.

**D.  Identification of the CONTRERAS as a Robber**

49.  I queried law enforcement databases using the number
which communicated with WATSON before the robbery, namely 909-
745-0929.  I learned the phone number to be associated to
CONTRERAS, who was on parole with CDCR for a felony robbery.  I

20

learned CONTRERAS listed the phone number which was used to
communicate with WATSON during a contact with CDCR on June 24,
2024.

50. On August 26, 2024, while examining CONTRERAS'
criminal history, I saw he was booked by the Colton Police
Department ("CPD") on August 23, 2024, being charged with home
invasion robbery, carjacking, sex with a foreign object with the
threat of retaliation, assault with a deadly weapon, and evading
a peace officer with a disregard for safety.  I contacted Det.
T. Jaeger from CPD who was familiar with CONTRERAS' arrest.

51. I learned that around 11:00 p.m. on August 22, 2024,
three masked men armed with pistols forced their way into a
victim's apartment while she was sleeping, pistol whipping the
victim and telling her they heard her apartment was where drugs,
guns, and money was located.  One of the subjects took the
victim into the bathroom, tied her up, and sexually assaulted
her while the others ransacked the apartment, ripping up
mattresses and the seat cushions.  The suspects stole the
victim's vehicle, and at approximately 1:30 a.m. on August 23,
2024, CONTRERAS was spotted driving the victim's stolen vehicle
in Yucaipa, California.  San Bernardino County Sheriff's
Department deputies initiated a stop of the vehicle, but
CONTRERAS failed to yield, leading officers on a wild, extended
pursuit, before CONTRERAS crashed into a CPD patrol unit which
had taken over the pursuit once it neared their city.  After
colliding, CONTRERAS ran from the wrecked vehicle.  While

fleeing, CONTRERAS discarded a grey Nike backpack which was recovered and found to contain a loaded silver and black pistol.

52. I asked Det. Jaeger to provide me photographs of clothing and contraband taken into custody during CONTRERAS' arrest. I examined the photos provided by Det. Jaeger and observed CONTRERAS' black sweat pants matched the "RUTHLESS" branded pants seen during the dispensary robbery. Additionally, the grey backpack with the red Nike Air Jordan logo matched the backpack CONTRERAS used during the robbery. Included below are two surveillance screenshots of CONTRERAS from the robbery, wearing the "RUTHLESS" pants and in possession of the backpack.



53. For comparison, I have included a photo below of the clothing taken off CONTRERAS by CPD following his arrest on August 23, 2024. I have also included a photo of the backpack which contained the firearm, as well as other evidence, including a Franklin batting glove, commercially sold marijuana

product, and a black ski mask taken into custody by CPD during CONTRERAS' arrest.

 

### E.    CONTRERAS' Firearm and Tattoos Match Those Seen the Robbery

54.  On September 3, 2024, I traveled to CPD to examine the evidence taken into custody during CONTRERAS' arrest.  I examined the Smith and Wesson model SD40 VE .40 caliber pistol displaying serial number FDD4611 which was found to contain 11 rounds of .40 caliber ammunition at the time of recovery.  I confirmed with ATF SA Paul Kirwan, an interstate nexus expert, that the SD40 VE model pistol is not manufactured in California.

55.  Prior to this investigation I have had numerous encounters with this model of firearm, which is marketed as Smith and Wesson's entry level offering in their polymer framed pistol lineup.  The name brand weapon's reliability combined with its low price point has made it popular among firearms traffickers and the criminal element.  The weapon is chambered

in both 9mm and .40 caliber and includes notable external features which are commonly visible on surveillance video recovered during violent crime investigations.  These identifiable features go beyond the model's somewhat recognizable silver slide and black color.  The model's forward and rear serrations on the slide of the weapon are distinct, as is the shape of the trigger guard and the contrasting black extractor.

56.  Based on my examination of the physical features visible on the weapon in CONTRERAS' hands during the dispensary robbery, I believe the weapon used by CONTRERAS during the robbery is a Smith and Wesson SD series pistol, the same make and model as the weapon recovered during CONTRERAS' arrest.

57.  While at CPD, I received additional photos which documented the entirety of their investigation into the home invasion, concluding with CONTRERAS arrest.  I compared visible tattoos in a series of photos CPD took of CONTRERAS in a sleeveless undershirt the night he was arrested.  The tattoos visible on CONTRERAS left arm and wrist appeared similar in color and location to partial tattoos visible on CONTRERAS during the robbery of the dispensary.

**F.   As of August 2024, CONTRERAS Was on Parole After a Felony Robbery Conviction and is Prohibited from Possessing Firearms**

58.  On September 4, 2024, I reviewed a criminal history report for CONTRERAS as well as online court databases from the Superior Court of California, Counties of San Bernardino and Riverside.  I learned CONTRERAS he has been convicted of

at least four felony crimes, including a conviction for robbery
in 2018 for which he was sentenced to seven years in prison in
the Superior Court for the State of California, County of San
Bernardino, case number FSB17004642.

   **G.   WATSON's Instagram Displays Ties to the BMW and
         Robbery Clothing**

   59.  On August 21, 2024, I reviewed a Riverside Police
Department ("RPD") report documenting the April 12, 2023,
probation search of a Moreno Valley residence belonging to
WATSON and his brother Keshaun, resulting in the location and
seizure of two firearms, one from each brother's bedroom.

   60.  Following the review of the report, I learned RPD
Officer N. Vargas was responsible for investigating and
apprehending WATSON following the location of the firearm.  I
learned during the Officer Vargas' investigation; an Instagram
account utilized by WATSON was identified.  The Instagram
account utilized username k2sumsicc and user ID 5741758140.

   61.  I examined the account which was set to private,
having no publicly viewable photos or videos.  On the profile
picture, a cartoon brain was set to a plain black background.
In a thought bubble a male subject appeared to be running
towards a stack of cash with attached angel wings.  The display
name showed "EBK💯," a common street and social media
abbreviation meaning "everybody killer."

   62.  On August 22, 2024, a search warrant for the
Instagram account believed to be operated or controlled by
WATSON was authored by Officer Keil and approved by the

Honorable Judge Michael A. Smith of the Superior Court of
California, County of San Bernardino.  Instagram account
requested content from June 1, 2024, through the signing date of
the search warrant.

64.  On August 27, 2024, I reviewed the return of content
for WATSON's Instagram account returned by Meta Platforms, Inc.
in response to the search warrant.  During my review, I located
dozens of photos and selfie style videos of WATSON, including
some which appeared to be from the driver's seat of an early
2000s BMW sedan.  I also located multiple photos of shoes
identical to those worn by WATSON during the robbery, as well
a matching shark mouth backpack which was visible through the
shattered rear window of WATSON's BMW.  In a photo posted as
story on August 7, 2024, two days before the robbery, the
distinct white high top Nike Air Jordan sneakers were visible
laced up on the feet of the person who took the photo, with the
background appearing to be inside a hotel room.

65.  Additional content posted to WATSON's Instagram
account in the days immediately following the robbery showed
WATSON in possession of cash and merchandise similar to what
would have been found inside the dispensary.  In a story posted
on August 10, 2024, cash was set on WATSON's lap next to a small
package of commercially packaged marijuana visible just out of
frame.  Across the photo was the words "I made dis today wtfk uk

doing."  In a video story posted to the account on August 11, 2024, more marijuana merchandise appeared to be offered for sale, with the video panning around a box full of unopened product set inside a vehicle which matched the interior of an early 2000s 3 series BMW sedan.  Visible across the screen while the video played were the words "If uk see anything uk want tapn" and "Everything 25."  Two of the marijuana branded items visible in the story were identical to the items seized from CONTRERAS during his arrest by CPD more than a week later.

**H.   CONTRERAS Instagram Yields Further Robbery Evidence**

66.  I also located an Instagram account I believed to operated or controlled by CONTRERAS, which was set to private and with only one publicly displayed photo for viewing.  The account, bearing username "crim.called_halo," user ID 16404398818, and the display name Tyrie Skavage Contreras, featured a single profile photo with a subject who appeared to be a black male adult with his back to the camera.  The subject in the photo had a close beard and short hair, with a build and jaw line which appeared to match prior booking photos of CONTRERAS.  The display name featured the word "Skavage" between CONTRERAS' first and last name, similar to the "Young Savage" moniker which was on file in CDCR parole records for CONTRARAS.

67.  On August 27, 2024, a search warrant for CONTRERAS Instagram account was authored by Officer Keil.  The warrant requested content from June 1, 2024, through the signing date.

The warrant was approved by the Honorable Judge Michael Libutti
of the Superior Court of California, County of San Bernardino.

68.   On August 29, 2024, I reviewed the return of content
for CONTRERAS' Instagram account.  During my review, I located
multiple photos sent from CONTRERAS' account to another user on
August 7, 2024.  In the first photo, CONTRERAS appeared pictured
in the back seat of sedan with his ski mask on, cash in his
hand, and a weapon resembling a Smith and Wesson SD series
pistol on his lap.  In another photo, a shirtless CONTRERAS is
pictured in a bedroom with an AR type rifle pointed towards the
camera.  In the background of the photo are black shoes similar
to the style worn by CONTRERAS during the robbery.

69.   In a message sent to another user at 10:31 p.m. on
August 9, 2024, just over six hours after the robbery, CONTRERAS
account wrote, "My bad bro that shyt was trash we hit for a safe
tht was new wit nothin in it."  The other user responded with a
voice message chastising CONTRERAS for hitting the dispensary
too early in the day.  The other user said it was too early in
the weekend to be successful, citing his own experience working
security in a dispensary.

**I.   Interstate Commerce**

70.   Based on training and experience, including the
collective knowledge of other law enforcement officers which has
been shared with me, I have learned controlled substances, such
as marijuana, travel in and have an effect on interstate and
foreign commerce.  Also, after consulting with the Assistant
United States Attorney assigned to this investigation, I

understand that the Supreme Court has stated that "if the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." *Taylor v. United States*, 136 S. Ct. 2074, 2080-81 (2016).  In this case, because the robbers targeted a federally controlled substance, the interstate commerce element for a Hobbs Act Robbery is satisfied.

## CONCLUSION

71. For all of the reasons described above, there is probable cause to believe that Tyrie CONTRERAS committed violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery); 924(c) (Use, Carry, or Brandish a Firearm in Furtherance of a Crime of Violence); and 922(g)(1) (Felon in Possession of a Firearm) and Kenyon WATSON committed a violation of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery).

Attested to by the applicant, <u>ATF SA Jarrett Keegan</u>, in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>4th</u> day of <u>September</u>, 2024.

_____

UNITED STATES MAGISTRATE JUDGE